745 So.2d 52 (1999)
Edward A. SWAN, Sr.
v.
NEW ORLEANS TERMINAL COMPANY.
No. 98-CA-2694.
Court of Appeal of Louisiana, Fourth Circuit.
May 21, 1999.
*54 Slater Law Firm, Benj. R. Slater, III, Mark E. Van Horn, Cory R. Cahn, New Orleans, Louisiana, Attorneys for Defendant/Appellant.
Plauche Maselli Landry & Parkerson, L.L.P., Arthur W. Landry, Elizabeth Salzer Schell, New Orleans, Louisiana, Attorneys for Defendant/Appellee.
Court composed of, Judge WILLIAM H. BYRNES III, Judge CHARLES R. JONES, Judge Pro Tempore JAMES A. GRAY II.
JONES, Judge.
Defendant/Appellant, New Orleans Terminal Company (NOTC), appeals the judgment of the trial court finding that it was contributorily negligent for the injuries sustained by its employee, Edward Swan, Sr. Domino Sugar Corporation (Domino) answered the appeal, and assigned as error the finding of the trial court that Domino was "independently negligent" for Mr. Swan's injuries because Domino was responsible for servicing the railroad switch that caused Mr. Swan's injuries. Accordingly, the trial court found both corporations to be 50% at fault for the plaintiff's injuries. After a review of the record, we affirm the judgment of the trial court.

FACTS
On January 27, 1993, the plaintiff, Edward Swan, Sr., was working at the Domino Sugar Corporation in Arabi, Louisiana when he sustained injuries to his lower back as a result of throwing a railroad switch, commonly known as the Brooklyn lead switch. The plaintiff, who was employed as an engine foreman with the NOTC, was asked by his supervisor, Ronald Thorton, to deposit twenty empty railroad cars in the Amstar refinery[1]. When Mr. Swan and his co-workers were bringing the empty railroad cars into the Domino refinery, he noticed that the railroad tracks were positioned away from the Domino refinery. Mr. Swan then attempted to throw the railroad switch to allow the railroad cars to go into the Domino refinery. As he pulled the lever from the cradle, Mr. Swan noticed that the switch had a lot of pressure. Nevertheless, he continued the process of throwing the switch until he pulled a muscle in his back. Mr. Swan then fell to the ground and was unable to move for several minutes. Mr. Swan had reported having problems with the switch to Mr. Thorton the day before his accident; however, no corrective action was taken since his report.

PROCEDURAL HISTORY
Mr. Swan filed a Petition for Damages in Orleans Parish against NOTC under the Federal Employers' Liability Act (FELA)[2]. The NOTC answered the petition and subsequently filed a third-party demand against Domino seeking contractual indemnification and/or contribution pursuant to the terms of their industrial sidetrack agreement. Domino was made a direct defendant in plaintiff's Amended and Restated Petition for Damages.
On January 14, 1998, the NOTC reached a settlement with Mr. Swan in the amount of $331,179.38. Domino acquiesced in the settlement by representing that the settlement amount was fair, reasonable and was a good faith resolution of the claims asserted by Mr. Swan in his petition. The trial proceeded as scheduled, but only encompassed the issue of contractual indemnity between the NOTC and Domino.
Following trial, the court ruled that Domino was independently negligent for *55 the railroad switch, and it determined that Mr. Swan was also negligent for using or attempting to use the railroad switch that he knew was in need of repairs. Because Mr. Swan was no longer a party to the lawsuit, the trial court imputed Mr. Swan's negligence to the NOTC, and assessed damages against Domino in the amount of $165,589.69representing 50% of the settlement agreement. From this judgment, the NOTC appeals. Domino then answered the appeal arguing that the trial court erred in determining that Domino, and not the NOTC, was the proximate cause of Mr. Swan's injuries.

CONTRACTUAL LIABILITY
The NOTC, which took the instant appeal, argued that the trial court erred in finding Mr. Swan negligent for activating the Brooklyn railroad switch. The NOTC also argued that the trial court erred in imputing his "alleged" negligence to the NOTC; thus, denying the NOTC the right to seek contribution or indemnification from Domino.
Though Domino denies being the proximate cause of Mr. Swan's injuries, Domino does argue that the trial court was correct in finding Mr. Swan negligent, and imputing his negligence to the NOTC. Thus, the primary question here is whether the NOTC, Domino or both entities were contractually liable for Mr. Swan's injuries.
The indemnification agreement between the NOTC and Domino reads in pertinent part:
That [Domino] will indemnify and save harmless the [NOTC] against any and all damage resulting from negligence of [Domino], its servants and employees, in and about said industrial tracks and the right of way therefor... If any claim or liability other than from fire shall arise from the joint or concurring negligence of both parties hereto, it shall be borne by them equally. [NOTC] hereby stipulates for this protection, as a condition of its agreement, herein expressed, to afford the above described terminal services and facilities to [Domino] elsewhere than at its station. (Emphasis added).
Domino also agreed to maintain the industrial tracks upon its premises in good condition and repair in accordance with the reasonable requirements of the NOTC. Domino further obligated itself to repair and maintain this equipment at its own costs and expense.
It is important to note that the plaintiff in the case sub judice chose not to sue the NOTC under Louisiana's Worker's Compensation Statute; however, suit was filed under the Federal Employer's Liability Act (FELA), which was designed to provide a remedy to railroad employees for injuries and death resulting from accidents on interstate roads. Consolidated Rail Corp. v. Gottshall, 512 U.S. 532, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994). Though a FELA case may be brought and adjudicated in state courts, the State's procedural laws will govern while the substantive law remains federal. Alabama Great Southern R.Co. v. Jackson, 587 So.2d 959 (Ala.1991), cert. dismissed, 502 U.S. 1083, 112 S.Ct. 994, 117 L.Ed.2d 155. (Emphasis added).
While the FELA is not a worker's compensation statute, it does preempt state law and is the exclusive remedy for injured railroad employees. See Rail Corp., supra; Earwood v. Norfolk Southern Ry. Co., 845 F.Supp. 880 (N.D.Ga. 1993). Thus, the statutory immunity shield which is normally given to employers in cases where employees were injured doing work-related duties are irrelevant here.
Nevertheless, in order for a plaintiff to recover under FELA, he must establish that (1) he was injured within the scope of his employment; (2) the employment was in furtherance of the railroad's commerce in interstate transportation; (3) his employer was negligent; and (4) this negligence played a part in causing his injury. Williams v. Southern Pacific *56 Transp. Co., 813 F.Supp. 1227 (S.D.Miss. 1992). Negligence is a federal question, which is not substantially different than what state and local laws define as being negligent. Alabama Great, supra.

Swan's Negligence
In the case sub judice, Domino argues that the evidence produced at trial showed that Domino's response to Mr. Swan's report that the Brooklyn lead switch[3] needed maintenance was not unreasonable. Further, Domino argues that it was not the cause-in-fact of Mr. Swan's injuries because Mr. Swan was fully aware that the switch had not been repaired. Moreover, Domino argues that once Mr. Swan discovered that the switch was "hard to throw," he was put on notice to discontinue use of the Brooklyn lead switch until repair could be made. Therefore, the act of continuing to throw the switch which Mr. Swan knew to be inoperable was negligent.
In response, the NOTC argues that Mr. Swan was not negligent simply because he proceeded to throw a difficult railroad switch. The Brooklyn lead switch, which was located on Domino's premises, was constantly exposed to the weather; yet, Domino failed to give Mr. Swan notice prior to using the switch on January 27, 1993, that the switch was still damaged. The NOTC also argues that the notice given by Mr. Swan the day before his accident was reasonable because the switch was merely "out of adjustment." The fact that Domino failed to take any action to repair the switch should not be imputed to the NOTC. We disagree.
A trial court's finding of fault and causation are essentially factual, subject to the manifest error standard of review. Gaines v. Daiichi Chuo Shipping (American), Inc., 95-1597 (La.App. 4 Cir. 4/24/96), 673 So.2d 1192. The trial court's determination of whether comparative fault applies is also a factual determination which is susceptible to the manifest-error standard of review. Warner v. City of New Orleans, 96-1296 (La.App. 4 Cir. 5/30/97), 694 So.2d 1231 writ denied 97-2037 (La.11/14/97), 703 So.2d 626.
Mr. Swan testified that he has been employed with the NOTC, a subsidiary of Norfolk Southern Railway, for over 20 years, and he had been working at the Domino refinery in Chalmette, Louisiana for at least six years prior to his injury. Mr. Swan received training and instructions from the NOTC on how to throw a switch along with training for other duties encompassed within his job as engine foreman. He testified that on average he throws or activates between 100 to 200 switches a day. Many of the switches, he testified, are difficult to throw, but they usually present about 20 pounds of resistance. However, when the switches are harder than normal, the railroad rule book requires that he contact the on-duty train master. When the train master is called, he then calls the maintenance person to the scene and the switch is repaired immediately so that the customer's commercial activities are not delayed. However, if the switch requires more than a few hours of attention, Mr. Swan testified that the maintenance person would then place a blue flag on the switch. The blue flag would indicate to other railroad employees that the switch is broken, and that all railroad personnel are prohibited from using the switch.
On the date of the accident, Mr. Swan testified that when he went to the Domino refinery to deposit twenty empty railroad cars, he noticed that the railroad tracks were not aligned in the Amstar/Domino position. He testified that the Brooklyn lead switch did not have a blue flag on it, despite the report he made one day earlier. Moreover, he testified that it did not appear that the switch was currently being worked on at the time he entered the *57 Domino refinery. Therefore, assuming the switch was repaired, Mr. Swan proceeded to throw the switch. However, after moving the lever out of the cradle, he realized that the switch required more than the usual 20 pounds of resistance. Mr. Swan then testified that he literally had to place all of his body weight on the switch to put the lever in the adjacent cradle.
On cross-examination, Mr. Swan testified that the reason he attempted to throw switches that are relatively hard or difficult to throw is because all switches in the Domino refinery have either been exposed to the weather or have been knocked out of adjustment by other railroad cars. Further, he conceded that it was at his discretion to determine which switches needed to be reported. Nevertheless, he admitted that he attempted to contact David Fowler, NOTC's terminal superintendent, but he was unable to report the condition to Mr. Fowler on January 26, 1993, because his hand-held radio could not reach the tower where Mr. Fowler was located on that day. Therefore, he reported the situation to Mr. Thorton. However, Mr. Swan's report to Mr. Thornton was that the switch was "dragging," "not operating properly," and was "hard to latch down."
Donald Cleland, NOTC's track supervisor, who was accepted by the trial court as an expert in the field of railroad switch inspection, maintenance and repair, testified that his duties as track supervisor were to coordinate maintenance activities for approximately 100 miles of railroad tracks for the NOTC, and to inspect the tracks as well as order repairs to be done to the damaged tracks. Mr. Cleland testified that he has had lots of experience with railroad switches especially the Brooklyn lead switch. He has given seminars and has instructed railroad employees on the proper method to be used when throwing switches. Mr. Cleland also testified that after Mr. Swan was injured he inspected the switch, and determined that the switch was out of adjustment because it contained too much pressure. Though he admitted that the switch was hard to throw, he also noted that there was nothing obvious about the switch which would alert a railroad employee that it was out of order. In fact, Mr. Cleland testified that he was only able to detect what was wrong with the Brooklyn lead switch after he looked underneath the switch at the crank mechanism.
Jeffrey Oser, Domino's engineering foreman, testified that he was authorized by Domino to inspect the railroad tracks and equipment, but his inspections occurred every two months, and if he determined that the switch needed immediate attention, then he would contact Mrs. Manning, Domino's traffic supervisor, to order repairs. Mr. Oser testified that he was notified about the condition of the Brooklyn lead switch by Arthur Hidalgo, Domino's logistics manager, on January 28, 1993. Mr. Oser subsequently inspected the switch and found that the switch was "a little harder than usual."
Dependable Railroad Construction (Dependable Railroad) repaired the switch January 28, 1993, at a cost of $227.20. The repair job encompassed oiling and adjusting the switch, and this task took less that two hours to perform. Mr. Oser admitted that during his time as an engineering foreman he had not spiked or blue flagged any switches at the Domino refinery. Further, he testified that Domino required him to execute a requisition form for every repair job done at the refinery. However, if the condition of the switch required immediate attention, he could avoid the requisition process.
Before proceeding to a consideration of the exigency of the moment, we reiterate that the court of appeal should not upset the factual findings of a trial court absent manifest error or unless clearly wrong. Stroik v. Ponseti, 96-2897 (La.9/9/97), 699 So.2d 1072, 1079. Where two reasonable views of the evidence exist, the factfinder's choice between them cannot be manifestly *58 erroneous or clearly wrong. Id. (Emphasis theirs).
In the case sub judice, we find that the trial court determination that Mr. Swan was negligent in throwing a switch that he found to be difficult and in need of repair, to be supported by the evidence. Mr. Swan testified that a railroad switch like the Brooklyn lead switch requires about 20 pounds of resistance; yet, he continued to throw the switch after realizing that he needed to use all of his body weight to do so. Mr. Swan testimony is, in pertinent part, states:
I reported [the switch] to [Ronald Thorton] and told him that he was to call Mrs. Sharon Manning and let her know that this switch needed repair. It was in bad condition. So on the 27th, at this point I had raised the switch from its locked position which was very difficult to do at that time[,] and [I] got it to almost a straight standing position within a few inches of straight up. I proceeded to bring it over to the other side, and as I was shoving it, I was in a-almost a bouncing, shoving move because the thing kept springing back to me. At that point I noticed I had pulled something in my back and it went down through my left side down into my left leg.
Moreover, Mr. Swan's testimony reflects that his training with the NOTC required him to abandon any operation of a switch he believed to be in "bad" condition. Though Mr. Cleland testified that there was nothing obvious about the switch to alert Mr. Swan that it was not operating properly, we find Mr. Swan's determination to throw this switch despite the difficulty he was having with it to be unreasonable.

Imputed Negligence
In this assignment of error, the NOTC argues that the trial court was manifestly erroneous in determining that Mr. Swan's negligence should be imputed to the NOTC. The NOTC argues that Mr. Swan gave reasonable notice to Domino to have the switch repaired the day before he was injured. The fact that Domino did not take any action to repair the switch, the NOTC argues, should not be a penalty to them. Furthermore, the NOTC argues that Domino had the responsibility of alerting all railroad employees that the switch was inoperable. Domino could have placed a blue flag on the switch or spiked the switchDomino chose not to do either one. Moreover, the NOTC argues that Domino stipulation that the settlement was fair and in good faith waived any right Domino had to contest full indemnification in favor of the NOTC. Thus, the NOTC maintains that full indemnification should have been permitted.
Domino, in response, argues that Mr. Swan ignored his years of training and instructions by throwing a switch he knew to be operating improperly. Though Mr. Swan reported the switch to Mr. Thornton the day before his injury, he did not confirm with Mr. Thornton or Mrs. Manning that the switch was in working order before he attempted to use the switch. Further, Domino argues that there was no indication in the record to suggest that Mr. Swan reported the condition of the switch to Mr. Fowler, his supervisor, until he was subsequently injured. We agree.
Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed. See LSA-C.C. art. 2320. When determining whether an employer is liable for the acts of an employee, factors to be considered are whether the tortious act was: (1) primarily employment rooted; (2) reasonably incidental to the performance of the employee's duties; (3) occurred on the employer's premises; and (4) occurred during hours of employment; however, each case is decided on its merits and it is not necessary that all factors be met in order to find liability. Jackson v. Ferrand, 94-1254 (La.App. 4 Cir. 12/28/94), 658 So.2d 691, citing Samuels v. *59 Southern Baptist Hospital, 594 So.2d 571 (La.App. 4 Cir.), writ denied, 599 So.2d 316 (La.1992). This Court has also concluded that there are certain employers who bear the additional duties of exercising reasonable care in hiring, retaining and supervising employees; these additional duties arise when the employees are allowed into the customers' or tenants' premises. Jackson, 658 So.2d at 699.
In the instant case, Mr. Swan was not only allowed onto Domino's premises, but he and other railroad employees had free access to the refinery because they had keys to the gate of the Domino refinery. Further, we find that depositing empty railroad cars on Domino's premises was within the course and scope of Mr. Swan's employment and in furtherance of the NOTC's business relationship with Domino. Nevertheless, Mr. Swan's decision to throw a switch that presented more difficulty to him than when he first reported the switch as being hard to throw was unreasonable. In essence, Mr. Swan should not have thrown the switch without first ascertaining whether the switch was safe for use.
In order to recover under the FELA, Mr. Swan must show that his employer was negligent and that this negligence played even the slightest part in the production of his injuries. Elliott v. Union Pacific R.Co., 863 F.Supp. 1384 (D.Colo.1994). In the instant case, we conclude that Mr. Swan ignored standard railroad procedure by proceeding to throw this inoperable switch that he deemed to be in bad condition 24 hours earlier. Further, Mr. Fowler, who is responsible for inspecting the railroad tracks and switches for the NOTC, was not notified about the switch until Mr. Swan was injured. Therefore, Mr. Swan and Domino were the only ones who could have avoided the injuries sustained by this FELA plaintiff. However, we also note that had the NOTC properly supervised Mr. Swan, this unfortunate incident would not have occurred. Moreover, because Mr. Swan was performing a duty in furtherance of his employer's business relationship with Domino, the trial court was correct in imputing Mr. Swan's negligence to his employer. Vicarious liability is imposed upon the employer without regard to his own negligence or fault; it is a consequence of the employment relationship. See Samuels 594 So.2d at 574. Having found that the NOTC was negligent for Mr. Swan's injuries, we pretermit any discussion on the burden of proof needed to obtain full indemnification.

Domino's Negligence
In the last assignment, Domino argues that the trial court erred in finding that it was independently negligent for Mr. Swan's injuries. In particular, Domino argues that the Brooklyn lead switch was not defective, and the condition of the switch was not such that it could alert railroad employees that it was not operating properly. Domino also argues that it was Mr. Swan's unreasonable desire to throw the switch that caused his injuries.
The NOTC, in response, argues that though the condition of the Brooklyn lead switch was not visible, Domino was obligated to maintain, repair and service this mechanism. Whereas the NOTC employees had the right to enter and use the railroad equipment located on Domino's property, Domino had the non-delegable duty to repair and service this equipment, and to ensure that this equipment was in a safe working condition. We agree.
Liability for injuries sustained by one on the premises of another may be based on either strict liability or negligence. McAllister v. Coats, 96-1069 (La. App. 1 Cir. 3/27/97), 691 So.2d 305, 309. The owner or person having custody of immovable property has a duty to keep such property in a reasonably safe condition; this person must discover any unreasonably dangerous condition on the premises and correct the condition or warn potential victims of its existence. Id. (Emphasis added).
*60 Under either negligence or strict liability, it must be shown that: (1) the [defendant] owned or had custody of the thing which caused the damage; (2) the thing at issue was defective in that it created an unreasonable risk of harm to others; (3) [the defendant] had actual or constructive knowledge or notice of the defect prior to the accident and failed to take corrective action within a reasonable time; and (4) causation. Sallis v. City of Bossier City, 28,483 (La.App. 2 Cir. 9/25/96), 680 So.2d 1333, 1336.
This Court has already determined that Domino was the custodian of the Brooklyn lead switch despite the fact that the NOTC employees had free access to the Domino refinery. We have also concluded that this switch did cause Mr. Swan's injuries, and that his prior notice to Domino to correct or repair the switch was reasonable.
It is undisputed by either party that the Brooklyn lead switch created a risk of harm; however, the question is whether that risk of harm was unreasonable. The reviewing court must give great weight to the factual conclusions of the trier of fact; yet, as a question of law, the issue of reasonableness is not subject to the manifest-error rule. Migues v. City of Lake Charles, 96-626 (La.App. 3 Cir. 11/6/96), 682 So.2d 946. The Louisiana Supreme Court reasoned in King v. Louviere, 543 So.2d 1327, 1328 (La.1989), that determining whether the evidence is sufficient to establish unreasonableness is a part of determining whether the duty to prevent an unreasonable risk of harm to others has been fulfilled. In other words, if the evidence in the record establishes that the risk of harm was unreasonable, then the reviewing court can presume that the defendant breached his duty of care. Thus, the reviewing court must conduct a de novo review of the record. Migues, 682 So.2d at 949.
Mr. Cleland testified that there were no visible signs of trouble or complications with the switch, but after examining it, he discovered that it was hard to throw and in need of repairs because it was "out of adjustment." Mr. Cleland also testified that several preventive measures could have been taken to avoid harm to railroad employees, but no action had been taken. Further, Mr. Cleland testified that derailment was a possible result from a switch that could not be properly activated.
Mr. Oser testified that Domino did not conduct periodic inspections of railroad equipment as required by railroad policies, rather, the repairs and maintenance to be done were performed on an "as needed" basis. Moreover, Mr. Oser testified that he conducted only a visual inspection of railroad equipment every two months. Only minor repairs were made to the switch by Dependable Railroad employees on January 28, 1993, and the repairs took less than two hours to perform. Incidently, the record reflects that Dependable Railroad employees were at the Domino refinery on the date Mr. Swan was injured, but before the accident took place. Though Mr. Oser had the authority to take whatever measures he deemed appropriate to insure the safety of railroad employees, he failed to do so until after Mr. Swan was injured.
Finally, Arthur Hidalgo, Domino's logistics manager, testified that he was the supervisor for Sharon Manning, until she was terminated because of her work performance with Domino. According to the record, Mrs. Manning was responsible for reporting, and scheduling all repairs to any railroad equipment at the Domino refinery that needed servicing. The record reflects that Mrs. Manning received notice of the condition of the railroad switch, but failed to timely notify the shift superintendent in charge of investigating and rectifying this type of problem.
In light of the testimony in the record, we find that Domino's failure to correct or repair the Brooklyn lead switch was unreasonable, and that Domino's failure created an unreasonable risk of harm to Mr. Swan and other railroad employees. Therefore, *61 we affirm that portion of the trial court's judgment finding that Domino was independently negligent in the causation of Mr. Swan's injuries.

DECREE
For the foregoing reasons, we hereby affirm the judgment of the trial court finding the Domino Sugar Corporation to be independently negligent in the causation of Edward Swan's injuries. Further, we affirm the judgment of the trial court finding Edward Swan negligent in the causation of his injuries and imputing his negligence to the New Orleans Terminal Company. Each party shall bear their own costs for this appeal.
AFFIRMED.
NOTES
[1] Many railroad employees commonly refer to the Domino refinery as the Amstar refinery.
[2] The suit was filed in Orleans Parish because this parish was the NOTC's domicile.
[3] The "Brooklyn lead switch" is the proper name for the railroad switch, which caused Mr. Swan's injuries on the day of the accident.