U CLARENCE E. McMANUS, Judge.
In this matter, we affirm a summary judgment granted in favor of Defendanb-Appellee, the Union Pacific Railroad Company, which dismissed the FELA claim of Plaintiff-Appellant, Fred A. Carr, Jr., and the claim of Third-Party Plaintiff, Allee, Allee & Allen Farms.
STATEMENT OF THE CASE
The instant suit was instituted on July 19, 2000, with Carr’s Petition naming as Defendants Union Pacific, Michael F. Shepherd, and Allee & Allen and their insurer Louisiana Farm Bureau Casualty Insurance Company. Carr subsequently amended his petition to correctly name Allee, Allee & Allen Farms and the Louisiana Farm Bureau Mutual Ins. Co. The suit arises out of a collision between a stalled trailer and a train operated by Union Pacific.
Union Pacific initially filed a general denial and a cross claim against Michael Shepherd and Allee and Louisiana Farm Bureau.
On March 29, 2001, however, Union Pacific filed a Motion for Summary Judgment, asserting that the accident that had given rise to this suit had not been caused by Union Pacific’s negligence. The motion was heard on April 30, 2001; judgment was signed on April 30, 2001, dismissing with prejudice Carr’s claims against the railroad.
On August 16, 2000, Louisiana Farm Bureau had filed an Answer and Cross Claim and Third Party Demand against Union Pacific, seeking To recover sums paid to its own insured Allee for the loss of the trailer. The judgment of April 30 also dismissed Allee’s claims.
12Plaintiff Carr and Allee timely filed motions for appeal, and they now raise the following claims.
Plaintiff Carr assigns as error:
1. The trial court erroneously granted summary judgment for the railroad when there was substantial evidence that the railroad breached its non-dele-gable duty to provide Mr. Carr a safe place to work. In granting summary judgment, the trial court completely ignored federal law establishing the non-delegable duty. In addition, in granting summary judgment, the trial court erroneously relied on state law to dismiss an action which is governed by federal law;
2. The trial court erroneously granted summary judgment where there was substantial evidence that actions taken by the railroad negligently caused or contributed to Mr. Carr’s injury. The trial court erroneously ignored substantial evidence that the railroad’s own actions created the dangerous condition at the crossing, that the railroad negligently delayed notifying its train of the blocked crossing, and that the railroad’s engineer ignored emergency warnings given to him.
Defendanb-Appellant Allee alleges the following errors:
1. The trial judge erred in finding that there were no material facts in dispute and that as a matter of law, Union Pacific Railroad Company was en *430 titled to summary judgment on the claims based upon the negligence and fault of Union Pacific in failing to comply with the duties implied upon it by the Federal Employers Liability Act, 45 U.S.C. § 51, et seq.
2. The trial, judge erred in finding that there were no material facts in dispute and that as a matter of law, Union Pacific was entitled to summary judgment on the claims based upon faulty and defective design and construction and maintenance, and lack of warnings, and remedial measures, after daily inspections, which are recognized causes of action under Louisiana law for either a railroad maintaining a public crossing or for a railroad voluntarily constructing, maintaining and daily inspecting a private railroad crossing;
3. The trial judge erred in finding that there were no material facts in dispute and that as a matter of law, Union Pacific was entitled to summary judgment on the claims based upon the failure of Union Pacific to adequately respond and stop the train prior to the intersection as required by Louisiana law for all trains having notice of a blocked intersection in time to stop and avoid a collision;
4. The trial judge erred in finding that there were no material facts in dispute and that as a matter of law, Union Pacific was entitled to Summary Judgment on the claims based upon negligence and fault of its engineer, Darryl R. Lawrence, in failing to see and heed the hand signal warnings of the disinterested witness, Eddie J. Hymel, over two miles before the blocked intersection which warnings were made in accordance with Union Pacific procedures and which should have been heeded, again according to Union Pacific procedures for the train to be brought to a stop well before the blocked intersection.
FACTS
The instant matter arises out of a collision between a train operated by Defendant-Appellee Union Pacific and a trailer that was stuck, at the time of the lacollision, on a railroad crossing, the Vegas crossing, located on property owned by Defendant Allee, Allee & Allen Farms. Plaintiff Carr was the conductor on the train when the accident occurred; as a result of the collision he suffered a knee injury. The trailer was wrecked beyond repair.
On the afternoon of August 23, 1999, the trailer was being hauled by Allee’s employee, Michael F. Shepherd. By way of deposition and a recorded statement, Shepherd testified to the following facts.
Shepherd testified that he had been working at Allee for some time as a machine operator/truck driver. On the day of the accident, Shepherd had been hauling a lowboy (described elsewhere in the record as a gooseneck lowboy) to move a dozer from one area of Allee’s property to another. He stated that Allee had owned the lowboy in question for approximately three years. Shepherd stated that he pulled the lowboy two to three times a week, mainly to move heavy equipment such as the doz-er, and that he sometimes towed the lowboy over railroad crossings four times a day. He stated that he had taken the lowboy over the Vegas crossing three or four times before the accident, and that he had never had a problem. He remembered having negotiated the Vegas crossing last “maybe” two weeks before the accident.
Shepherd described the lowboy’s stalling as follows. As he approached the crossing in question, he had been hauling the trailer down a dirt road that traversed the crossing. He stated that as he tried to go over *431 the train tracks, and after he had pulled the trailer halfway across the tracks, the trailer got “hung up.” He stated that even after he felt the trailer “scraping” as he crossed the tracks he continued to try to make it over. After Shepherd was stuck on the tracks, he hailed a passerby, Money Shepherd, and asked Money to call his boss. Shepherd detailed various efforts to move the trailer off of the tracks, in which he was assisted by Ronnie Allen and Stacy Allee, and none of which was successful. He stated that a St. James Parish Sheriffs Deputy stopped while the group was engaged in trying to move the trailer; this officer, Gufielle Keller, radioed the Sheriffs Office to alert |4them of the problem. Shepherd himself did not call the Sheriffs Office, or any emergency number, nor did Allen or Allee.
Shepherd testified that the oncoming train had ultimately collided with the stalled trailer, pushing the trailer into the ditch alongside the tracks. The train stopped not quite five hundred feet from the impact.
Shepherd testified that the road crossing the train tracks had been maintained by Allee, though he testified that Union Pacific had done maintenance on the crossing in the past. He did admit, however, that he had never seen anyone from Union Pacific actually working on the crossing. He testified that Union Pacific’s work on the crossing had “rais[ed] the track up,” and that this occurred as “they put new asphalt to dress the apron up to cross over. When they bust it up, they got to come back and put some new stuff down.”
Shepherd testified that “as far as he could tell,” it had been the weight of the trailer that had caused it to get stuck on the tracks. And finally, he stated that the trailer had been stuck on the crossing for an hour before the collision occurred.
The remainder of evidence offered regarding the motion for summary judgment is found in deposition testimony, recorded statements, various Sheriffs Office records, Union Pacific’s reports of its investigation into the accident, and various experts’ reports.
Deputy Keller testified that he had spotted the stalled trailer by chance, as he had been driving past the crossing, at about 2:00 that afternoon. Keller had passed the crossing on his way to a specific assignment; though he had called his dispatcher, he had been unable to stay at the scene, and only heard the collision, he believed, at about 2:15. Keller was able to testify that the trailer was stuck on the tracks because the “feet,” or “pods” of the trailer were “down,” and that this “low position” had prevented the trailer from “clearing” the track.
Jody Ordeneaux, who had been a deputy with St. James Parish at the time of the accident, had responded to Keller’s dispatch to the Sheriffs Office alerting them to the problem. Ordeneaux had arrived on the scene within five minutes of | ¡¿he radio call. He stated that he had been on the scene for approximately fifteen minutes before the collision occurred, and that he had been “back and forth” with the Sheriffs Office to see whether Union Pacific had been alerted to the problem. He described Shepherd’s predicament thus, “There was a lowboy tractor-trailer .... which is basically a long trailer that sits low to the ground to load up equipment on it. It has very little ground clearance, I would say maybe a foot of ground clearance at the most. That’s a lot. And that trailer was resting on the tracks. In other words, it had — its ground clearance was completely bottomed out. It was stuck on the track.” Ordeneaux stated that the track in question is “very heavily trav *432 eled,” with a train coming “every hour on the hour.”
Ordeneaux had prepared the police report for the accident, and in the report, he stated that the Parish had been notified of the problem at 2:09 that afternoon.
Deputy Ryan Donadieu, also of the St. James Parish Sheriffs Office, had been at the scene of the accident, and stated that immediately before the collision, as soon as it had become apparent that the trailer couldn’t be budged, he had attempted to warn the oncoming train by driving his marked unit towards the train with the bar lights activated.
St. James Parish Deputies George Gra-nier and Doniel Worthington had been on duty on the afternoon of the collision as communications dispatchers. Worthington was unable to remember many details of the incident; Granier was unable to recall the exact time Deputy Keller’s call had come in over the radio. Granier testified that as soon as the call had come in, he had begun to look for Union Pacific’s telephone number and had dialed the number listed in the “blue book,” which number was busy. In addition, Keller testified that the Sheriffs Office had at least one other number that proved to be outdated, as he discovered in the attempts to contact Union Pacific.
The dispatch log book shows that the office received notice of the situation at 2:09, and that Worthington had spoken with “Chris” at 2:14.
|fiA transcript of Worthington’s conversation with Chris shows that Chris answered the telephone at 2:19. Worthing-ton alerted Chris to the problem, and at 2:21, Chris (while Worthington was still on the line) called the Union Pacific Emergency Hotline. As Chris asked the Hotline to hold, at 2:23, Worthington informed Chris that the collision had already occurred.
R. Dale Bray, employed with Union Pacific’s Risk Management Communication Center, testified that once Union Pacific is informed of any problem on the tracks, the office is able to alert any approaching trains within two minutes.
Darryl Lawrence had been the engineer on the train on the day in question. By way of deposition testimony, he stated that the train had been operating at “slow speed” on that afternoon, on alert for the increased activity on the adjoining farms during caning season. Lawrence testified that when he had first seen the trailer he hadn’t realized it was stuck. As he approached the crossing, however, and as he blew the train’s whistle, he realized that the trailer was stuck, and activated the emergency braking system. Though Lawrence at first stated that he would have been able to stop the train if he had been alerted to the stalled trailer five minutes before he reached the crossing, he then admitted that he couldn’t be sure this was so. Finally, Lawrence testified that he had not seen any individual, or any other vehicle, at the closest crossing approaching the Vegas crossing, warning him of danger — “There was nothing like that.”
Eddie Hymel, by way of a recorded statement, stated that he had been with Stacey Allee when Allee had learned of the stuck trailer. Hymel stated that after Al-lee had departed to assist Shepherd, and as he was returning to his own farm, he noticed the train approaching. He testified that he had sped to the next closest crossing to the Vegas crossing, parked his truck on the tracks, and blinked his headlights to alert the train engineer. He testified that as the train approached his position, he had driven his truck off of the tracks, then got out of the car and made “hand signals” to the engineer.
*433 17Plaintiff Carr testified that he had been the conductor on the train on the afternoon in question, and that part of his duties had been to keep a lookout down the tracks for various signals. He testified that he had first seen the stalled trailer when the train was fifteen to twenty car lengths from the crossing, and that Lawrence had already begun to activate the brakes as he turned to warn him.
James Pratt, a manager of track maintenance for Union Pacific, testified that during the period in which the accident occurred he and other employees inspected the track in question on a daily basis. He stated that the railroad had last done work on the crossing in 1997 to replace defective ties and to resurface the crossing; he testified that the railroad had been responsible for laying the asphalt over the crossing. He stated that the asphalt is spread to tie the road into the crossing, to make the fit “as smooth” as possible, which prevents the crossing’s boards from being damaged by the “rocking” of vehicular traffic. And while Pratt testified that he did not think the crossing safe for lowboy traffic, he also testified that the railroad is not responsible for posting such warnings on private crossings. Finally, Pratt testified that the daily inspections of the track had never revealed any problems with the crossing.
Robert L. Cathers, who investigated the accident for the railroad, testified that the trailer had stalled because “[it] was just too low.”
In an affidavit executed by David Brown, a consulting engineer, Brown expresses the opinion that the crossing in question violated AASHTO (American Association of State Highway Transportation Officials) and AREA (American Railway Engineering Association) design standards, which require the surface of a highway to be in the “same plane” as the top of the rails for a distance of two feet outside of the rails, and which prohibit any difference between the surface and the nearest rail of more than three inches higher or six inches lower.
An affidavit executed by William Fogarty, an expert in accident reconstruction, included Fogarty’s opinion that the AASH-TO and AREA design standards are not a factor in determining negligence in the maintenance of any lsparticular crossing: Fogarty states that the cited standards apply as guidelines solely for “design activity.” In addition, Fogarty states that the AREA manual explicitly excludes maintenance as part of its guidelines. Finally, Fogarty states that the road in question, a dirt road on private property, does not qualify as a “highway” under AASHTO guidelines.
Excerpts from the AREA and AASHTO manuals support Fogarty’s statements. The AREA Manual for Railway Engineering states that the manual “is not a maintenance manual per se since the development of standards or criteria for the maintenance of railway roadway, track and structures has always been considered to be the prerogative of the individual railways.” A reproduced portion of the AASHTO Policy on Geometric Design of Highways and Streets (1990) states that the manual presents “design values,” (our emphasis) and that the organization has published a separate guidebook — Designing Safer Roads: Practices for Resurfacing, Restoration and Rehabilitation — ña-use on maintenance projects. In addition, the manual states that it includes “design guidelines” for “freeways, arterials, collectors and local roads .... paralleling the functional classification used in highway planning.”
Finally, while there are references in pleadings to a “steep” crossing, the record contains photographs of the crossing that *434 show what seems to be an almost flat surface. The gradient, or, rise, of the crossing is just barely discernable in a photograph taken from a position on the track itself. A photograph taken from the dirt road as the road approaches the tracks, and taken from a very low angle (almost at ground level), shows no inclination at all.
CARR’S ASSIGNMENT NUMBER ONE; ALLEE’S ASSIGNMENTS NUMBERS ONE AND TWO
In these assignments of error, both Appellants argue that the trial judge erred in granting the motion for summary judgment. Appellant Carr argues that the trial judge improperly applied a state law in this FELA action; Appellant Allee argues that the judge erroneously ignored state laws under which Union Pacific’s | flactions would be found negligent. However, we find none of Appellants’ arguments availing.
Appellate courts review summary judgments de novo under the same criteria that govern the district court’s consideration of whether summary judgment is appropriate. Taylor v. Rowell, 98-2865, at 3 (La.5/18/99), 736 So.2d 812, 814; Smith v. Our Lady of the Lake Hosp., Inc., 639 So.2d 730, 750-1 (La.1994); Schroeder v. Board of Sup’rs of Louisiana State University, 591 So.2d 342, 345 (La.1991); Brown v. Ackel, 00-287, at 5 (La.App. 5 Cir. 7/25/00), 767 So.2d 827, 830.
The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action, except those disallowed by Article 969.[1] The procedure is favored and shall be construed to accomplish these ends. LSA-C.C.P. art. 966 A(2); Taylor, 98-2865 at 3, 736 So.2d at 814, Schroeder, 591 So.2d at 342; Brown, 00-287 at 5, 767 So.2d at 830.
The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966 B;[2] LSA-C.C.P. art. 966 C(1); Taylor, 98-2865 at 3, 736 So.2d at 814; Schroeder, 591 So.2d at 342; Brown, 00-287 at 5, 767 So.2d at 827.
A “fact” is “material” if its existence or nonexistence may be essential to a party’s cause of action under the applicable theory of recovery. Smith, 639 So.2d at 751; Penalber v. Blount, 550 So.2d 577, 583 (La.1989); Bauer v. Dyer, 00-1778, at 13 (La.App. 5 Cir. 2/28/01), 782 So.2d 1133, 1140, writ denied, 01-822 (La.5/25/01), 793 So.2d 162. Or, put another way, any decision as to the propriety of a grant of the motion must be made with reference to the substantive law applicable to the case. Only in the context of the applicable substantive law |incan issues of material fact be ascertained. Johnson v. Drury, 99-608, 99-1071, at 6 (La.App. 5 Cir. 6/2/00), 763 So.2d 103, 108; Sun Belt Constructors, Div. of MCC Constructors, Inc. v. T & R Dragline Service, Inc., 527 So.2d 350, 352 (La.App. 5 Cir.1988).
The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the mov- *435 ant’s burden does not require him to negate all essential elements of the adverse party’s claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact. LSA-C.C.P. art. 966 C(2); Johnson, 99-608 at 6, 763 So.2d at 108.
Plaintiff Carr’s claim against Union Pacific is based on the Federal Employers’ Liability Act, or FELA, 45 U.S.C. § 51 and following. Section 51 holds, in pertinent part, that:
Every common carrier by railroad while engaging in commerce between any of the several States or Territories, or between any of the States and Territories, or between the District of Columbia and any of the States or Territories or between the District of Columbia or any of the States or Territories and any Foreign nation or nations, shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce .... resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.
Though a FELA case may be brought and adjudicated in state courts, the state’s procedural laws will govern while the substantive law remains federal. Swan v. New Orleans Terminal Company, 98-2694, at 4 (La.App. 4 Cir. 5/21/99), 745 So.2d 52, 55 (citations omitted); Duhon v. Southern Pacific Transp. Co., 98-268, at 4 (La.App. 3 Cir. 10/7/98), 720 So.2d 117, 120 (citations omitted).
_|jjThe substantive law regarding Carr’s claim, therefore, is federal. To prevail in a FELA claim, the plaintiff must prove that (1) the defendant is a common carrier by railroad engaged in interstate commerce; (2) he was employed by the defendant with duties advancing such commerce; (3) his injuries were sustained while he was so employed; and (4) his injuries resulted from the defendant’s negligence. Smith v. Medical and Surgical Clinic Association, 96-10913, at 5 (5th Cir.7/31/97), 118 F.3d 416, 419; Swan, 98-2694 at 5, 745 So.2d at 55-6.
There does not seem to be any question as to the first three prongs of plaintiffs burden; the question here is whether his injuries resulted from Union Pacific’s negligence. We find, based on all the exhibits filed into the record by all parties, that they did not.
While FELA does not impose a specific affirmative duty on railroads to maintain crossings, the scope of duty imposed under the act encompasses a duty on the part of the railroads to inspect even third parties’ premises for possible hazards to their employees. Nivens v. St. Louis Southwestern Railway Company, 425 F.2d 114, 118 (5th Cir.1970).[3] Even having considered this rather onerous burden placed on railroads, however, we agree with the trial judge’s finding that Union Pacific was not shown to be negligent in the instant matter.
Shephard testified that Union Pacific had “raised” the crossing over the years *436 until it had become impassable for his lowboy trailer, and that this maintenance (or, ill-maintenance) of the crossing had been the cause of his getting stuck, and thus, of the accident. However, the evidence was undisputed that the railroad had last worked on the crossing in 1997, and Shepherd also testified that he had last been over the crossing with a lowboy trailer only two weeks before the accident. Shepherd testified, in fact, that he had never had any problems with the crossing in the past.
|12Shepherd testified that he had heard a “scraping” as he tried to make it over the crossing, but had continued forward in spite of this warning. Further, one of the deputies who had seen the trailer lodged on the track testified that it had been the pods, or, feet, of the trailer, placed in the “down” position, that had caused the trailer to become stuck on the railings. Once Shepherd heard the scraping noises, the noises should have warned him that he could not make the crossing, and he should have made an attempt to back away: we note that no one has testified that the paving leading into the crossing would have prevented him from doing so.
Union Pacific’s track inspector testified that he had not noticed, during his daily inspection of the tracks, any particular problem with the crossing in question. And Union Pacific’s accident reconstruction expert stated that the design standards that Carr argues the railroad violated in their paving of the crossing are not applicable to show negligent maintenance of existing tracks. Carr has not provided any other evidence that demonstrates that the asphalt laid down by Union Pacific on the crossing area was the cause of the accident in which he was injured.
Allee’s claim against Union Pacific is controlled by state law. As Allee alleged general negligence on Union Pacific’s part, liability on these grounds would be imposed pursuant to LSA-C.C. art. 2315 (obligations arising without agreement). In addition, since there was no question that Union Pacific had been paving the approaches to the crossing, the voluntary assumption of that duty operates as another possible source of liability: the voluntary assumption of a duty imposes the duty to perform it in a non-negligent manner.[4] Rick v. State Department of Transportation and Development, 93-1776, 93-1784, at 7 (La.1/14/94), 630 So.2d 1271, 1275. However, for the reasons discussed above, we do not find that any harm caused to Allee was caused by any breach of any obligation on the part of Union Pacific. The issue of duty is not the only question to be resolved: Plaintiff Al-lee also has the burden of proving that any breach of duty (if any) was the cause of their harm. Rick, cited immediately above; Pulling v. Pulling ex rel. Desmare, 00-1869, at 4 (La.App. 5 Cir. 5/30/01), 788 So.2d 706, 708. Shepherd testified that he had been over the crossing in question, without incident, before the date of the accident; he had been over the crossing subsequent to the railroad’s last maintenance work at the crossing.
Neither claimant has shown that the railroad was negligent in paving, or maintaining the paving of, the crossing in question; neither has suggested material facts sufficient to defeat Union Pacific’s motion for summary judgment.
CARR’S ASSIGNMENT NUMBER TWO; ALLEE’S ASSIGNMENTS NUMBERS THREE AND FOUR
In these assignments of error, Appellants argue that because Union Pacific *437 delayed warning the engineer of the train in question of the blocked crossing, they were negligent in trying to avoid an actual collision. Appellant Allee also argues that the engineer was himself negligent in ignoring Eddie Hymel’s warnings that the train was approaching a hazard. We don’t find any of these assertions persuasive.
Shepherd testified without contradiction that he had been stuck on the tracks for one hour before the collision occurred. Deputy Ordeneaux testified that the track in question was heavily trafficked. Yet, even as an entire hour passed, neither Shepherd nor any of his “bosses” made any attempt to notify anyone who might have tried to contact the railroad.
Once the stranded trailer had been seen, just by chance, by a passing sheriffs deputy, the sheriffs office began immediately to try to notify the railroad. And any delay caused when the sheriffs dispatchers couldn’t immediately contact the railroad was plainly not the fault of the railroad: obviously, since they did ultimately contact Union Pacific, the sheriffs office did have a correct number available to them for rail emergencies.
Dale Bray, of Union Pacific’s Risk Management Communication Center, testified without contradiction that the railroad would have been able to notify the train of an approaching hazard within two minutes, had they been warned in a | utimely manner. As the situation unfolded, however, the railroad’s hotline personnel were on the line just receiving this warning at the instant the collision rendered any warning unnecessary.
Nor do we find that Appellants have raised a question of material fact by calling attention to the admitted discrepancy in the Sheriffs Office’s records. If there is an inconsistency in the records about what time the call to Union Pacific’s hotline went through (between the log’s 2:14 and the transcript’s 2:19), the inconsistency does not amount to a question of material fact. The transcript of the call is the more telling exhibit — the actual exchange between the Sheriffs Office and Chris is what we find determinative: the transcript shows without any question, as noted above, that Union Pacific was just receiving notice of the stalled trailer when the accident took place. Further, the engineer of the train, Darryl Lawrence, could not state unequivocally that he would have been able to stop the train with five minutes’ warning. Therefore, since five minutes would not have given the train time to avoid the collision, a possible difference of five minutes in when the phone call was made cannot raise the possibility that Union Pacific was warned in time to prevent the collision.
Neither can we say that the train’s engineer was negligent in “ignoring” Eddie Hymel’s warnings. We see no reason to doubt that Hymel did try to warn the approaching train. However, Darryl Lawrence testified that he had not seen Hy-mel, and we see no reason to doubt this testimony. Hymel cannot testify for certain that Lawrence had seen him: if Hy-mel assumes that Lawrence saw him because Lawrence sounded the train’s horn, Lawrence testified that the horn is customarily sounded at all public and private crossings, pursuant to Union Pacific policy. So, Appellants’ assertions notwithstanding, the juxtaposition of Hymel’s and Lawrence’s statements does not necessarily create an issue of material fact.
In sum, we can’t find that any actions on Union Pacific’s part caused unreasonable risk to Allee or to Shepherd. And if Al-lee’s and Carr’s harms were caused as a result of negligence, there was no negligence on the part of Union | ^Pacific. The trial judge was correct to grant the summary judgment. We therefore affirm that *438 judgment, with Appellants each to bear half of all costs of this appeal.
AFFIRMED.

. Article 969 disallows the use of summary judgment procedures in some domestic proceedings.

. Language not cited, language regarding service of pleadings, was amended during the latest legislative session. 2001 La. Acts 771. This language, and the amendment, have no bearing on a determination of this matter.

. It is for this reason that all arguments about whether the crossing in question was "private” or "public” are of no moment; this dispute does not create a question of material fact.

. For this reason, it is not material whether the crossing was "public” or "private.”