572 So.2d 1051 (1990)
Glenn J. CREPPEL, Jr.
v.
CORONATION SHIPPING CO., Thenamaris Management, Inc. and Terrance Doyle.
No. 90-CA-425.
Court of Appeal of Louisiana, Fifth Circuit.
December 12, 1990.
Writ Denied February 22, 1991.
*1052 Capitelli & Wicker, T. Carey Wicker, III, Richard A. Bordelon, New Orleans, Phillip J. Boudousque, Gretna, for plaintiff-appellant.
Chaffe, McCall, Phillips, Toler & Sarpy, Robert H. Murphy, Thomas D. Forbes, Kenneth J. Servay, New Orleans, for defendants-appellees.
Before CHEHARDY, C.J., and GAUDIN and GRISBAUM, JJ.
CHEHARDY, Chief Judge.
Plaintiff, Glenn J. Creppel, Jr., appeals a judgment dismissing his personal injury suit against defendants Coronation Shipping Company, Ltd. (Coronation), and its insurer, United Kingdom Steam Ship Assurance Association (Bermuda), Ltd. (United Kingdom). The case arose from a ship collision on the Mississippi River near Harahan, Louisiana.
On appeal, plaintiff first contends the trial judge erred in failing to instruct the jury on the maritime presumption of negligence, which is applied to collisions involving drifting vessels. Plaintiff also asserts the jury was clearly wrong in failing to find defendant Coronation negligent. We agree with the latter contention and reverse the judgment.
The facts show on the day of the accident plaintiff was engaged in his employment with T.T. Barge Cleaning Facility stripping chemicals from a barge at the company's plant on the east bank of the *1053 Mississippi River. Suddenly, plaintiff's fellow workers raised an alarm, yelling to him to run for his life because a drifting ship was about to collide with the barges. Plaintiff and his co-workers ran in the same direction away from the potential area of impact, impelled by the fear of explosion, due to the volatile nature of the chemicals in and on the barges. During the flight, plaintiff had to jump down approximately 10 feet to another barge. As he landed, he injured his right foot.
As it turned out, the drifting tanker collided with a fleet of barges next to the one plaintiff had been working on and no explosion occurred. However, the ship sliced in half and sank two barges, and "piled up" the other barges. The entire incident took place in less than a minute.
Following the accident, it was determined the ship's steering failed, causing it to drift and collide with the barges. In turn, the steering failure was caused when a fitting broke. The fitting secured a copper metering line to the starboard hydraulic pressure gauge. As a result, the hydraulic fluid reservoir emptied and the vessel was bereft of steering ability.
Plaintiff subsequently filed an action for negligence pursuant to general maritime law and the law of admiralty against Coronation, United Kingdom, Thenamaris Ship Management, Inc., and the river pilot on the M/T SEABRAVERY at the time of the collision, Terrance Doyle. (Thenamaris Ship Management, Inc., was eventually dismissed on joint motion of the parties.)
Commercial Union Insurance Company intervened to recover compensation benefits and medical payments made to and on behalf of plaintiff under the Longshore and Harborworker's Compensation Act.
The case was tried before a jury on September 26-29, 1989, and October 2-4, 1989. At the close of plaintiff's case, the trial judge granted Terrance Doyle's motion for involuntary dismissal. Following the trial, the jury returned a verdict finding that the plaintiff sustained an injury in the collision, but also that Coronation was not negligent. Judgment was thereafter rendered on October 5, 1989, dismissing plaintiff's action.
The first issue we are presented with involves the trial judge's refusal to instruct the jury with certain jury charges submitted by plaintiff. The charges relate to the legal presumption of negligence applied by the courts in certain types of maritime collision cases, otherwise known as allision in the vernacular of maritime law.
LSA-C.C.P. art. 1793 provides that a party may not assign as error the giving or failure to give a jury instruction unless he has made a specific objection and unless he has stated the grounds for the objection. A blanket objection does not suffice, but must be accompanied by a statement of the grounds of the objection, otherwise it is waived. Bechtel v. Entringer Bakeries, Inc., 422 So.2d 1299 (La.App. 5 Cir.1982); see also, Bienvenu v. State Farm Auto. Ins., 545 So.2d 581 (La.App. 5 Cir.1989).
In this case, plaintiff objected to the trial judge's refusal to charge the jury with his requested charges numbered 13-16. Three of those involved the maritime presumption of negligence referred to herein. Plaintiff did not, however, state the grounds for the objections. As a result, the objections were not preserved for appeal and he cannot now assert error in this regard.
Plaintiff next contends the jury committed manifest error in failing to find defendant shipowner negligent. He asserts Coronation negligently failed to follow the manufacturer's steering gear manual by permitting a soldered copper ferrule fitting and copper tubing to be used to connect the starboard steering gauge instead of seamless steel, and in failing to properly inspect this compromise to the system. He also contends the shipowner was negligent in operating the vessel with an open isolation valve in violation of the steering manual instructions, and in allowing an inadequate or defective alarm system to exist in the system.
Defendants rebut these allegations, first, by asserting the evidence shows the use of copper was and is common in these types of steering systems. Defendants refer to the manual and claim it does not require *1054 the use of seamless steel, although the latter is the material originally placed in the system.
Defendants next point out the testimony indicates the isolation valve is customarily left open while navigating in closed waterways. They assert the manual recommends the valve be kept closed in order to protect the gauges, but there is nothing in the manual which requires the valve to be closed for reasons relating to the integrity of the steering system.
Third, defendants argue the low-level alarm system (which sounds when the hydraulic fluid is low) was neither inadequate nor defective. They point out the evidence shows the alarms on the ship were in accordance with international regulations. They were functioning properly and the crew took the available precautionary measures when the alarms sounded. In addition, defendants contend the alarms were irrelevant to the case because the steering failure occurred only a minute preceding impact and the bridge was aware of the failure before the alarms sounded.
In regard to the issue of Coronation's fault, plaintiff first presented the testimony of J.T. Doyle, the river pilot for the SEABRAVERY, on cross-examination. As a river pilot, Doyle navigates ships in the river between New Orleans and Baton Rouge.
Doyle stated that just before the accident the SEABRAVERY, carrying flammable and volatile jet fuel (naptha), was negotiating a turn in the river. He testified he gave the command "port 10" to bring the vessel around the bend, then asked for "mid-ship" to stop the turn and straighten the vessel's movement. Doyle said the ship responded properly to the port 10 maneuver, but the rudder failed to respond to the mid-ship command. Doyle stated he quickly asked for a "hard to starboard" position to bring the ship, which was continuing to drift toward land, back to the middle of the river. He again received no response. Doyle said he looked up at the rudder indicator, which remained on "port 10", and he knew there was a problem at that time. Consequently, Doyle told the captain and blew the danger signal.
Doyle stated he saw a push boat and barge carrying a red flag, indicating it contained flammable material, coming toward the ship and he was worried the SEABRAVERY was going to hit it, so he tried to radio a warning. Doyle also called Vessel Traffic Service. He testified the ship missed the oncoming barge, but pushed into a line of barges tied to the shore "like a hot knife going through butter".
Doyle stated that the incident lasted no more than one minute. He noted he was afraid of an explosion during the entire time due to the ship's cargo. He also stated he did not recall hearing the ship's steering alarm sound at any time prior to the impact.
Plaintiff next presented the expert testimony of a marine engineer, Ralston Cole. Cole inspected the ship in April 1989. He explained the steering failed because a line to one of the gauges pulled or was pushed loose from the fitting causing the hydraulic pumps to lose 150 liters of hydraulic fluid at once, resulting in an inability to move the ship's rudder. He pointed out the line which became disengaged was made of copper instead of steel as, he contended, was required by the steering manual. He further stated the fitting used was not designed for the system and that even if a copper line was allowed, that fitting was not the correct type to connect a copper line. Cole also stated the size of the copper line was inappropriately small.
Cole next discussed the isolation valve. He explained the purpose of the valve is to isolate the gauge from the rest of the system. The closed valve prevents the fluid from flowing past into the gauge portion of the system. He admitted the manual recommends the valve be kept closed, except when reading the gauges in order to protect them, but asserted it also protects the integrity of the system and would also have prevented the fluid to escape in this case. He pointed out the valve was easily opened and closed and stated the stress of leaving the valve open would eventually *1055 cause the tubes (lines) to stretch, resulting in inadequate readings from the gauges.
Cole next discussed the alarms related to the steering system. He explained the ship had two alarm systemsone for loss of pressure and one for low level of fluid. He contended the low level alarm was set too low and he believed it failed to sound properly. Otherwise it would have sounded to alert the crew of the failure.
On cross-examination Cole noted the ship was built in 1972 and that he did not know how long the copper line had been in the ship. He stated copper could be sufficiently strong to perform in such a system, but claimed this one was half of the Lloyds Register of Shipping (Lloyds) equation for the pressure involved. (Lloyds, he noted, is a British safety regulatory body which describes the manner in which a ship should be built and operated and which inspects ships for insurance purposes annually.) He admitted Lloyds does not prohibit the use of copper and that the Lloyds inspector passed the SEABRAVERY after the accident even though she was again fitted with copper lines in the steering system. He further testified there are no rules or regulations requiring the isolation valve to be closed all the time. He maintained his opinion, however, that leaving the valve open impaired the accuracy of the gauges.
Plaintiff also called Scott Hartley, the U.S. Coast Guard inspector who investigated the accident, to the stand. He, like Cole, interpreted the manual to require steel tubing and also believed the isolation valve should be kept closed to prevent fluctuation in the readings. He made no determination about the alarms but in his report stated the accident was caused by a "degree" of negligence on Coronation's part.
On cross-examination, Hartley was questioned about his report, wherein he stated he could not determine whether leaving the valve open was or was not customary among those traveling the Mississippi River, in anticipation of the testimony of defendants' witnesses that it was customary due to the difficulty of navigating the river. In addition, Hartley testified, per his report, that he found no facts indicating any other negligence on the part of Coronation, other than a "degree" of negligence related to their failure to follow the manual (as to the copper lines and open isolation valve).
Defendants presented the testimony of Nicholas Marinos, Evagelos Drakas, and Berend Haveman. Marinos was chief engineer on the SEABRAVERY prior to the accident from May 27, 1987 to August 9, 1987. Drakas was second engineer from January 7, 1987 to December 18, 1987, and was aboard during the collision. Haveman, a marine surveyor, testified as defendants' expert.
Marinos testified the steering system in the SEABRAVERY was the same when the accident occurred as when he came aboard. He contended the use of copper with seamless steel was not uncommon in the shipping industry and that he had seen brass used with steel, as well as copper. He noted he had served on similar or larger ships and never had an inspector or government official require all-steel. Marinos stated he read the manual when he came on board the SEABRAVERY and agreed it was important to follow its instructions. However, he did not agree with plaintiff's witnesses that the manual required steel to be used in outfitting the system. He pointed out the manual does not specifically state that seamless steel must be used, but only refers to the fact steel was used originally.
In regard to the isolation valve, Marinos testified it was customary on all ships to keep the valve open while traveling closed waterways and, in particular, the Mississippi River, although it only took seconds to open the valve. He stated this was done on the engineer's orders so that the crew would have quick reference to the equipment's functioning because of the added stresses caused by maneuvering in the currents of the river.
Marinos stated everything was in working order when he arrived on the SEABRAVERY, including the low level alarm and pressure alarm. He said the steering equipment with the copper line would not have been disassembled unless a problem *1056 was visible, i.e. steam escaping or fluid leakage. Marinos testified the equipment received regular ordinary maintenance and that he was on board in August 1987 when Lloyds inspected and approved the ship in conjunction with Coronation's purchase of the SEABRAVERY at that time.
Drakas testified next for defendants and he supported Marinos' testimony. In addition, Drakas informed the court that he was responsible for the daily maintenance of the steering gear system. In this regard, he noted, he had not observed any unusually high pressures during operation of the system, nor had any problems been evident.
Drakas stated he tested the equipment before the ship left the dock on the day of the collision and it operated properly then and during the trip downriver. He stated he stayed in the engine room throughout the trip and was there when the equipment failed.
Just prior to impact, Drakas said, the low-pressure alarm sounded in the control room. Drakas sent his third engineer to check the cause and in seconds received orders from the bridge designed to bring the ship away from shore. He testified despite all efforts, however, the ship hit something, throwing him to the floor. He stated the episode lasted no more than a minute, and noted the low-level alarm sounded either at or just after the collision. After the impact, Drakas stated he went to the bridge where the low-level alarm was still sounding.
Drakas testified the broken equipment was replaced with copper, which was inspected and approved by Lloyds and the U.S. Coast Guard. In answer to questioning on cross-examination, he stated (as had Marinos) that he would have changed the pipe fitting had he known it had been soldered, but he could not have made that determination without taking that portion of the system apart.
Defendants' final witness, Berend Haveman, a marine surveyor, explained that Lloyds is a non-profit international group which sets the rules as to how to build, maintain and repair safe vessels. The group, he stated, inspects ships on behalf of most governments. He noted the SEABRAVERY held the highest classification both before and after the collision.
Haveman, a one-time inspector for Lloyds, testified he had examined a number of steering gears similar to the SEABRAVERY's and he stated they were usually made of copper or steel, or copper nickle or stainless. He contended copper is a permitted material and that it is used in about one-third of all vessels. He further stated the size of the tube, contrary to Cole's testimony, is adequate for the pressure. He noted there was nothing visible in his examination of the system shortly after the collision to indicate problems with the tube and/or the fitting.
In regard to the valve, Haveman stated he read the manual and interpreted the section relating to the isolation valve to mean it should be kept closed solely for the purpose of protecting the gauges. He contended it was better practice to leave the valve open while doing difficult maneuvering in the river so that the crew could discover early signs of malfunction.
Haveman stated he tested the low-level alarm the same evening following the accident when he went aboard the SEABRAVERY to inspect it on defendants' behalf. He testified it worked. He noted the alarm was designed to give reasonable notice that the oil level was low and needed to be replenished, but pointed out that if the system lost pressure, the low-level alarm would ring after the pressure alarm sounded.
In the general introduction section of the steering gear manual, Sub-section 3, it is stated:
"The Steering Gear is designed to give long and consistent trouble free service, but this service is dependent on the proper operation, care and regular maintenance of the equipment. This Manual gives detailed instructions and information relevant to the carrying out of these procedures and the instructions should be carefully followed to ensure that this *1057 trouble free service is realised [sic] in practice."
The references to the material of the lines and the position of the isolation valve, at issue herein, provide as follows:
1. "SMALL BORE PIPING (FIG. 10).
7.1) In addition to the main pressure piping, seamless steel pressure piping of smaller bore (hence the general term `small bore piping') is used in the following hydraulic lines:
Charge
Servo and Isolation Valves
Control
Pressure Gauge
Tank Charging
Drain & Cooling"
2. "4.2) The oil pressure in a steering gear must of necessity, fluctuate according to the operational requirements of the gear. These fluctuations may impair the accuracy in reading of a pressure gauge, so it is recommended that the isolating valves associated with the gauges should be kept closed, except when actual readings of the gauges are being taken."
The jury, presented with conflicting evidence, apparently chose to believe defendants' witnesses regarding the interpretation of these provisions of the manual, the permitted use of copper lines and the custom of traveling in closed waters with the isolation valve open, finding no negligence on the part of Coronation. Where the evidence is conflicting the reasonable evaluation of credibility and inference of facts should not be disturbed by the appellate court. Rosell v. ESCO, 549 So.2d 840 (La. 1989). The court of appeal may upset a jury's factual findings only when it is determined the fact finder was clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1979). However, "where documents or objective evidence so contradict the witness's story, or that story itself is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit the witness's story, the Court of Appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination." Rosell v. ESCO, supra, at 844-845. Furthermore, this court is not obliged to accept the trier of fact's verdict where it is not supported by objective evidence. See Shroyer v. Grush, 555 So.2d 534 (La.App. 4 Cir.1989).
In this case, the reasonable inferences from reading the manual as a whole, along with the testimony of the witnesses, indicate the material of choice for the system was steel, not copper. Any deviation from the configuration of the original components may have been permitted, but placed a burden of inspection on defendant, because any change challenged the integrity of the system. The procedure to inspect the components was simple and would have revealed the improperly-soldered fitting. And, by admission of the chief engineer and the second engineer, they would not have permitted a soldered fitting to be used had they noticed it, but would have changed it for a more reliable fitting.
Defendant relies on the inspections made by Lloyds and others, as well as the custom of the industry in this regard. However, neither of these factors relieve defendant of the duty to operate a safe vessel or to use a steering system in accordance with the manufacturer's specifications.
The above-mentioned principles apply to the operation of the isolation valve as well. Over time, such customary acts may have compromised its integrity. Further, had the valve been closed, it clearly would have prevented the loss of the 150 liters of fluid, and the accident would not have occurred.
In regard to the alarm systems, the evidence showed the low-level alarm either sounded too late or not at all, but was of no use in preventing the loss of steering fluid. Had it gone off timely, as intended by its design, the ship's crew could have closed the isolation valve, thus preventing the failed steering and subsequent collision. Thus, we conclude it was not set properly.
After reviewing the testimony and documents in this matter, we can arrive at no *1058 other determination than that the jury was manifestly erroneous in its failure to find Coronation negligent. Even without the benefit of a presumption of negligence being applied to this case, we find the evidence preponderates in favor of plaintiff. Defendant owed a duty to plaintiff to protect him against the injury caused by its failure to operate a safe vessel. It breached that duty and must now compensate plaintiff for the damages he sustained.
Plaintiff claims he suffered a shattered foot bone, resulting in a permanent disability. Additionally, he asserts he suffered a disabling back injury as a result of his attempt to escape the impending collision. For these damages he requests this Court to award him $425,000 for past, present and future pain and suffering, $29,315 for reimbursement of medical expenses and $297,486 for loss of future wages.
Defendant asserts plaintiff suffered a heel injury which he exacerbated. It disputes his back injury allegation, claiming the back injury, if existing, did not result from this accident.
The alleged damages in this case involve a serious foot injury, the development of an abnormal pain reflex called reflex sympathetic dystrophy, about which little is known medically, and a low-back injury to the L5-S1 disc. The medicals are complicated and disputed. Because the jury never reached this issue in the trial court, the manifest error rule does not apply. However, in our opinion a trier of fact should properly resolve this issue. Thus, under our authority to do what is just and proper on the record in a case, we find a remand for a trial on this issue of damages to be warranted. LSA-C.C.P. art. 2164.
Accordingly, the judgment of the trial court is hereby reversed and the case is remanded to the trial court for proceedings consistent with this opinion. Appellee is to pay costs of this appeal.
REVERSED AND REMANDED.