1 «MARION F. EDWARDS, Judge.
Appellants, Penny Porche Dehart, individually and on behalf of her minor child Wendy Marie Dehart, Regina Dehart Hutchinson, and Alfreda Little on behalf of her minor children Niki Ann Dehart and Tamara Marie Dehart (collectively, the De-harts), appeal a verdict and judgment in favor of defendant Burlington Northern and Santa Fe Railway Company (BNSF) finding no liability, and dismissing their suits with prejudice. We affirm.
The suit was one for damages for wrongful death brought by the widow and four children of Rustie Dehart. Mrs. Penny Dehart is the widow, and Ms. Alfreda Little is the mother of Dehart’s children from a prior marriage, including Regina. On May 21, 1998, Mr. Dehart suffered injuries after attempting to negotiate the *250 Lagarde railroad crossing in Boutte, Louisiana. Mr. Dehart was operating a tractor-trailer rig carrying a 70,000-pound load of fill, and attempting to clear the tracks, when the cab of his rig was struck by the BNSF train. The impact caused the trailer and cab to flip, causing catastrophic injuries to which Mr. Dehart later Lsuccumbed. The Deharts claim that the defective design and maintenance of the Lagarde Crossing and the negligent operation of the train were proximate causes of the fatal injury. Mrs. Dehart and Ms. Little filed separate suits for wrongful damages, and the matters were consolidated for trial.
The trial was held over a five-day period in August 2002. At the conclusion of trial, the jury determined that there wa.s no negligence on the part of BNSF with respect to operation of the train on that day and found that BNSF was not negligent in the operation, design or maintenance of the train, the crossing, or its approaches.
On appeal, the Deharts urge that the trial court erred in preventing the jury from hearing relevant evidence on responsibility for maintenance and control of La-garde Crossing and its approaches and in preventing the jury from hearing expert testimony on applicable safe design standards. They also urged that the jury erred in finding that BNSF was not negligent in the design or maintenance of the crossing, nor in the operation of its train.
At trial, it was stipulated that BNSF is the owner of the subject property, including the right of way at the Lagarde crossing. The ownership interest extends thirty-five feet on both sides from the middle of the track.
The crossing is a 70-foot long private driveway providing access from Louisiana Highway 631 in Boutte to the property of Dr. Edmond Jeansonne. Both an east and west approach from Highway 631 converge on the south side of the tracks to form a single roadway, creating a “Y”-shaped design, over the rails to the Jeansonne property on the north side.
Dr. Jeansonne testified that he purchased the property in August of 1997. The land had been in use primarily for cattle grazing and the doctor determined to change the use to a wildlife preserve. To this end, he began digging a lake about six months later. The contractors who excavated the land would be able to sell the fill for profit. J.E. Enterprises, Mr. Dehart’s employer, was one of the independent 15contractors hauling the dirt. Dr. Jeansonne saw no need to notify the railroad of this project, and had no problems himself at the crossing. He did not perform maintenance work on the roadway approaches to the railroad crossing; however, he visited the property three or four times per week, and noticed railroad crews doing certain types of maintenance. On the railroad right of way, they sprayed vegetation, and replaced a number of wooden railroad ties. However, they did not do any labor on the approach to the crossing.
Mr. Sylvester Brooks, a truck driver, followed Mr. Dehart to the property of Dr. Jeansonne to haul fill. When they initially passed over the railroad crossing, neither driver had a problem. As the trucks were being loaded, Mr. Brooks told Mr. Dehart that he was going to exit on the other ramp “because I didn’t think I was going to make it out of there ... The trailer was a thirty-two foot. So it was too long. I knew I wasn’t going to be able to make it ...” Mr. Brooks was standing on top of his vehicle, two to three hundred yards from the tracks, and witnessed the impact. Mr. Dehart approached the tracks, waited, and then went across to the right. He pulled up trying to maneuver himself, going back and forth. This went on for *251 about five minutes. Mr. Brooks heard the train whistle, but there were a lot of trees and he could not see the train until it was too late. According to the witness, Mr. Dehart couldn’t see the train. “In order to come off that ramp the way he was on there you had to watch the left side so the truck don’t roll off and you have to watch the right side so the trailer won’t roll off.” Although Mr. Dehart was maneuvering the track, Mr. Brooks did not know if he was stuck on the tracks. Mr. Brooks thought that the train was going faster than 45 miles per hour.
Conley Martin testified that on the date of the accident, he was an investigating officer for St. Charles Parish. His Investigation disclosed that the train struck the trailer at approximately its mid-point. According to the witness, truck drivers had communicated via CB radio that it was easier to cross the tracks Lon the eastbound side than on the west side, which is where Mr. Dehart attempted to cross. There were no signs on the crossing to this effect, and no obvious defects in the roadway approaches to the crossing. While speaking with the engineer and conductor, there were no signs of intoxication or impairment so as to justify the taking of a drag screen.
The conductor and engineer reported traveling at approximately 45 miles per hour, and slowed prior to impact, indicating the train attempted to brake. There are no signs anywhere on the crossing to alert a driver as to which ramp should be used to exit from the property to the highway. In the officer’s opinion, the curve east of the Lagarde Crossing did not appear to be a contributing factor to the cause of the accident and is not on a public right of way. In the report generated by investigation of the accident, it was stated that the Dehart vehicle failed to yield, while no violations were noted for the train. Some witnesses reported that the trailer was stopped on the tracks, and that when Dehart saw the train, he tried to maneuver the vehicle by moving it back and forth. There was nothing to obscure Dehart’s vision at that point. There was a railroad crossing sign located on both sides of the crossing. The officer concluded that visibility in the curve was approximately one quarter of a mile, and Mr. Dehart could have seen the approaching train and would have been able to yield.
Mr. John Mattingly, a professional land surveyor, was qualified as an expert in civil engineering land surveying. Mr. Mattingly performed a survey of the area at the crossing. Coming from Dr. Jeansonne’s property south across the tracks, the southwest ramp is 75 feet long, and there was a five and one-half foot elevation from the roadway to the top of the rail.
Eric Jones, Mr. Dehart’s employer, testified that he instructed Dehart to pick up fill from the Jeansonne property. That was the first time Mr. Dehart visited the site. He was an excellent worker and had never been involved in an accident.
[7Dr. Ken Heathington, a civil engineer, was qualified as an expert in transportation engineering, traffic engineering, highway design, operations and safety, railroad highway grade crossing design, operations and safety and accident reconstruction. He examined other crossings in the area, and determined that there was a low volume of vehicular traffic, which was a factor in the finding that there were no previous accidents at the site. There was no posted speed limit for drivers. Dr. Heathington found there was a significantly reduced sight distance at the crossing and although there were two cross buck signs, they did not comply with standards set by the American Association of State Highway and Transportation Officials (AASHTO). These were the only traffic control devices *252 at the location. The maximum train speed at the crossing is seventy miles per hour for passenger trains, and sixty for freight trains, and this is the speed he used in sight distance calculations. Relative to sighting, Mr. Dehart would have had to face two visual quadrants; the crossing at its Northeast and Northwest quadrants had a 97.9 % and 98.7% sight deficiencies, respectively, so that the driver could not see an approaching train in time, in either direction, as he crossed. However, sight distance was not a cause of the accident.
In Dr. Heathington’s opinion, the main problem with the crossing was the road surface and grading. The applicable standard is no more that a six-inch drop or three-inch rise in 30 feet from the nearest rail. The grade on which Dehart was traveling violated this standard. There is a six-foot drop to the highway and a short turning radius. The width of the roadway and crossing, and the drop-off, did not leave enough room to pull a tractor all the way over, while attempting a turn, to get the back wheels in place and not go “off track” and hung between the rails. Because of the steep grade, Dehart could not get across the track to turn the truck. He would have been looking down the hill, and to see the train he would have had | sto be looking up and back, about 120 degrees. By lengthening the approach, the grade can be softened.
Jim Scott, qualified as an expert in train operations, testified that an event recorder electronically records the speed and actions of the crew, and that each locomotive should have one. In this case, there was not one that would have been helpful. The whistle activity should have been recorded that day by the lead locomotive, and it is absolutely critical, in the event of an accident, to download information from the recorder to back up the information given by the crew. However, it is not mandatory that the recorder contain information on the whistle or horn. As the engineer approaches a grade crossing, he must blow the whistle until he occupies the crossing. The conductor should have continued to blow the horn, in an emergency signal, to afford further warning to the vehicle on the track, as well as apply the emergency brake. On cross-examination, Mr. Scott testified that he issued his written report after seeing photographs of the crossing, but had not at that time inspected the area. Further, he had not had the benefit of the conductor’s deposition testimony, although after reading it, his opinion did not change. The witness had no information to contradict the testimony of the conductor, that he blew the whistle until 150 feet prior to impact (approximately four seconds before the collision) and then dropped to the floor. He testified that had the conductor continued to blow the whistle for three more seconds before the accident, Mr. Dehart may have had time to step out of the truck. Mr. Scott was not asked to calculate the speed of the train.
Tim Huya, manager of public projects for BNSF in Texas and Louisiana, testified that whether the railroad owns the crossing or it is a right of way, maintenance is the same, although there are no state laws regarding the railroads duty to maintain private crossings. On a private driveway approach, the private landowner maintains the approach up to two feet of the rail. The railroad |9maintains the grounds between the rails, up to two feet outside either the rails or ties. According to the witness, the railroad owns the land within 35 feet of either side, but not the roadway. A truck travels the track about three or four times a week, examining for hazards including those on the right of way. BNSF does not maintain the roadway. The railroad sprays to control vegetation so as not to obstruct vision, and maintains the ballasts, tracks, and rails. Typically, *253 no maintenance is performed on driveways and approaches to private property unless the railroad is notified of a problem. There are no reports of any unsafe conditions on the subject property. Prior to trial, Mr. Huya examined the site itself as well as photographs, and found no problems. After obtaining the trackage rights from Southern Pacific, approximately five months before the accident, BNSF would have inspected the track before it ran the first train. No problems were reported relative to the crossing. BNSF did not design the crossing, but only put in crossing boards between the rails and two feet out.
Edward Blondell, the BNSF engineer, testified the train was traveling at 45 miles per hour. At one-quarter mile before every crossing is a whistle board, and he is required to turn on the bell and blow the whistle. He did this and as the locomotive came around the curve, he saw a truck stopped on the tracks. Within a second or two, he put the train in emergency, continuing to blow the whistle and applying the brakes. The trailer was on the tracks, and the truck started to back up, and then stopped. The truck began to pull ahead again, and the cab cleared the track. The witness continued to blow the whistle up to approximately 150 feet, at which point he laid on the floor. He had the impression that the driver saw him because of the way he began to move the truck. It is a judgment call as to when to stop blowing the whistle and hit the floor, and in this case, the engineer had sounded the warning for a quarter mile.
|inMr. Chad Fisher was a conductor for BNSF. On the day of the accident, he and Mr. Blondell checked the engines and cars, and there were no problems with the brakes. The train was authorized to go 45 miles per horn[1], and did not travel in excess of that. Prior to the curve, Mr. Blondell had begun blowing the whistle, and as the train came around the curve he saw a truck crossing the tracks. Mr. Blondell had already thrown the train into emergency. At that point, the trailer was on the tracks, backed up, then went forward and stopped. It did not appear to be stuck. Mr. Blondell lay down on the floor three or four seconds before impact. After the accident, Mr. Fisher saw no problems with the track or the road bed, no holes or ruts.
Dr. William Fogarty testified for the defense as an expert in accident reconstruction, human factors, and traffic engineering. In his opinion, Mr. Dehart had an opportunity to avoid the accident. He measured the visibility distance, and factored in the speed of the train, determining that the driver had several opportunities to see the approaching train. Even assuming the driver had some difficulty maneuvering his vehicle as he tried to leave the crossing, he could still have backed up and gotten off the track. When the train was in the “hazardous proximity” of between 750 and 900 feet away, it would have been clearly visible. Once the train is visible and audible, the driver on the track should either back off or get out of the vehicle. At the position Mr. Dehart was in, he would have been able to look to his left and see the train. Mr. Dehart had a duty to look and see what he should have seen, and to have heard the whistle. He should have had his windows down, and his radio off. Dr. Fogarty agreed that Mr. Dehart was grossly inattentive under the circumstances, given the amount of time he had.
There was nothing the train crew could have done, at that point, to avoid the accident. There were no factors that forced the victim to continue to move forward rather than backing off, and it would have been unreasonable on his part to do so.
*254 |uIn the realm of traffic engineering and accident reconstruction, a trap occurs within a period of time over which the driver has no control, and cannot react to avoid a collision. A trap is instantaneous and generally does not exceed four seconds of time. Assuming the truck was not stalled, and that there were no visibility problems noted, Mr. Dehart was not entrapped. If he had been able to use the same approach entering, he should not have had a problem exiting, and the addition of a seventy thousand pound load would not have affected the swift path of the steering capability for angles.
Dr. Fogarty did not find the crossing was excessively steep. The AASHTO standards deal with paved highways. For local dirt roads, the standards are less. Design standards apply to what is designed today, and the “Y” shape of the approach reduces the grade to make it less steep. The grade of the road was not, in his opinion, a cause of the accident and did not violate design standards. Relative to sight distances, the AASHTO standards used by Dr. Heathington apply to major highways at railroad crossings rather than low volume roads such as the one in question. Had the train been placed in emergency 650 feet earlier, it would have stopped at the point of impact.
Mr. Bobby Lilly lives across the highway from the Lagarde crossing. On the day of the accident, he was sitting in his yard and was able to see the crossing, down to the bend in the tracks. Mr. De-hart came onto the ramp with a load, pulling down until his tandem axle got up to the rail, almost to the highway, and then would back up. He did this four or five times, and was there about 15 or 20 minutes. He continued to try to go to the right, and did not attempt the other exit. When the train came around the bend, Mr. Lilly heard the whistle: “It looked like [the conductor] was laying on the horn.” When he first saw the train and heard the horn, the cab of the truck was parked on the track, and had been for 8 to 10 minutes. Had Mr. Dehart looked to his left, he could have seen the train. The | struck did not appear to be stuck. At that point, Mr. Lilly ran. Since the train hit the trailer and not the cab, Mr. Lilly thought the truck must have moved. Mr. Lilly had not seen any other trucks that had a problem crossing.
Mr. Gary Wolf was qualified as an expert in train handling and in the calculation of train speed, braking distances and the actions of the crew. He did not need the event recorder, but had enough information to make the necessary estimates, such as the weight and length of the cars, the type of brake system, the kind of track, and the speed of the train. He calculated the speed by determining that the train could not have seen the truck until it came around the curve, the first place the brakes could have been applied, and the stopping distance was 1660 feet, about 652 feet past the point of impact. Evaluating the curvature of the track, the witness estimated the engineer would have first seen the truck about 1200 to 1300 feet away. Using a mathematical formula, Mr. Wolf determined that the brakes were applied about 1000 feet prior to the point of impact, and were in full emergency at about 900 feet. The engineer probably hesitated three or four seconds before applying the brake. Mr. Wolf found no fault with the actions or timing of the crew, and did not have to rely on their statements in order to make his evaluations. Mr. Lilly’s testimony as to when the whistle began to blow was consistent with the duty of the crew. Crews are advised to get on the floor in emergencies, and the fact that he may not have blown the horn in the final two seconds prior to impact would not have made a difference.
*255 On appeal, the Deharts complain that the trial court erroneously refused admission of certain evidence relative to maintenance and control of the Lagarde crossing and its approaches. They suggest that the trial court selectively prevented them from eliciting all relevant testimony proving that BNF had in fact undertaken maintenance at the site and actively controlled it. They first urge that it was error for the trial judge to exclude the following proffered testimony of Dr. Jeansonne:
haQ. Doctor Jeansonne, Burlington, I think testified earlierfsic] Burlington Railroad Corporation placed some railroad ties on your property?
A. Yes.
Q. Did they call you and ask your permission to do that?
A. No, they were just there one day.
Q. From the time you bought the property to this day has Burlington Railroad Corporation called you and asked your permission to travel from Highway 631 to your property?
A. Never.
The Deharts further complain that the trial court erroneously refused to allow testimony by Dr. Heathington relative to his findings on BNSF’s maintenance of other crossings in the area. Dr. Heathing-ton testified that he examined those locales “to see what kind of emphasis was given to safety at other crossing [sic] in the corridor.” BNSF objected to such evidence on the basis that no foundation had been laid to establish the relevance of such testimony, emphasizing that the Lagarde crossing is a private driveway, unlike the other public crossings in the area. Mr. Huya acknowledged that BNSF maintained private crossings in the same manner as public ones. Under LSA-R.S. 45:323, and as testified to by Mr. Huya, the railroads have a duty to maintain a crossing for a distance of two feet on the outside of each rail of the tracks, together with the necessary headers, when the tracks are laid on or across a public street.
The Deharts also urge the trial court should have permitted testimony from Dr. Jeansonne, on rebuttal, to counter Mr. Huya’s testimony that BNSF had the duty to maintain the crossing only to a distance of two feet on either side of the track. In the case-in-chief, Dr. Jeansonne testified that he believed that the responsibility for approach belonged to the railroad, but that he had no problems with its upkeep or maintenance. Mr. Huya verified that there were no complaints from Dr. Jean-sonne.
In order to determine whether liability exists under the facts of a particular case, our Courts have adopted a duty-risk analysis. Under this analysis, a plaintiff must prove that the conduct in question was a cause-in-fact of the resulting harm, | uthe defendant owed a duty of care to the plaintiff, the requisite duty was breached by the defendant and the risk of harm was within the scope of protection afforded by the duty breached.[1] At issue during the trial was the Deharts’ contention that BNSF breached a duty to properly maintain the Lagarde crossing. BNSF admits that it had a duty of maintenance, but that its duty was not breached.
As defined in La. C.E. Art. 401, “relevant evidence” means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. We fail to see how Dr. Jeansonne’s opinion of the railroad’s maintenance obligations was relevant to the inquiry of *256 whether BNSF had a duty to maintain the approach, and whether that duty was breached. In the same vein, the proffered testimony quoted above does not constitute evidence of maintenance of the roadway approach that may have been undertaken by BNSF. The testimony was properly excluded.
The Deharts complain that the trial court abused its discretion in preventing the jury from hearing Dr. Heathington’s recommendations for improving the La-garde crossing. The court found the testimony was irrelevant. We agree. Dr. Heathington testified at length as to every perceived deficiency at the site, most of which did not pertain to his opinion of causation. His suggestions for upgrading the crossing would have added nothing material to the issue of duty and breach of duty.
The Deharts assert that BNSF did not supply documentation to support its position that the landowner was responsible for the maintenance and control of the approaches. However, the plaintiffs have the burden of proof, and there is no evidence in the record to suggest that the railroad had a responsibility beyond the statutory requirements. Vegetation was controlled at the site. No problems were |1Breported to BNSF. Although the voluntary assumption of a duty imposes the duty to perform it in a non-negligent manner[2], nothing in the record indicates that BNSF undertook maintenance of the grounds at the Lagarde crossing beyond what was required by law.
The admission or exclusion of evidence is within the discretion of the trial judge, and his rulings will not be disturbed absent an abuse of that discretion.[3] We see no abuse of discretion in the trial court’s refusal to admit the contested testimony.
Plaintiffs next allege that the trial court committed legal error in its refusal to charge the jury on the “dangerous trap” doctrine. A party may not assign as error the giving or the failure to give an instruction unless he objects thereto either before the jury retires to consider its verdict or immediately after the jury retires, stating specifically the matter to which he objects and the grounds of his objection. La. C.C.P. Art. 1793(C). A blanket objection does not suffice, but must be accompanied by a statement of the grounds of the objection, otherwise it is waived.[4] The record discloses that the Deharts made only a general objection to the court’s refusal to include the requested charge. Thus, the issue was not preserved for our review.
Finally, the Deharts aver that the jury was manifestly erroneous in its finding that BNSF was not negligent in the design or maintenance of the Lagarde crossing, and that it was not negligent in the operation of its train.
An appellate court may not disturb the conclusions reached by a jury regarding *257 factual matters in the absence of “manifest error” or unless a particular finding of fact was “clearly wrong.” This Court has announced a two-part inquiry for the reversal of the trier of 11fifact’s determinations: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the factfinder, and (2) the appellate court must also determine that the record establishes that the finding is clearly wrong or manifestly erroneous. Thus, the inquiry is whether the factual findings are reasonable, not whether the trier of fact was right or wrong. If, in light of the record in its entirety, the trial court’s findings are reasonable, then the appellate court may not reverse, even if convinced it would have weighed the evidence differently sitting as the trier of fact.[5]
On review, we find that there was a basis on which the jury could have reasonably concluded that BNSF was not negligent.
The railroad’s duties regarding the crossing include operating the crossing such that it can be safely traversed by motorists using reasonable care.[6] Although the plaintiffs’ experts testified that there was negligence in both the design of the crossing and the operation of the train, there was also ample evidence that Mr. Dehart was inattentive to the situation. The eyewitnesses to the accident testified that Mr. Dehart was on the tracks between 5 and 20 minutes before the train struck. There was testimony that the vehicle was not stuck, but both the cab and trailer moved back and forth across the tracks, and that when the train rounded the curve, Mr. Dehart was parked, or stopped, on the rail. There was both lay and expert testimony that the train was not speeding, that it blew its horn and whistle and began breaking approximately 900 1000 feet prior to impact. There was lay and expert testimony that there was no problem with visibility at the point of impact. Dr. Fogarty testified that the crossing was not dangerously steep, and both he and Mr. Wolf agreed that the train crew acted reasonably.
Where the testimony of expert witnesses differs, it is the responsibility of the trier of fact to determine which evidence is most credible.[7] In light of the record in its entirety, the jury’s findings of fact had a reasonable basis from the evidence |17admitted at trial, and were not clearly wrong. For the foregoing reasons, the verdict and judgment dismissing BNSF is affirmed.
BNSF filed a Motion For Appeal from a summary judgment dismissing Dr. Jean-sonne from the proceedings. BNSF admits that if the jury verdict is upheld, that appeal is rendered moot. Because we have affirmed the jury, we dismiss the second appeal taken by BNSF.
JURY VERDICT AND JUDGMENT AFFIRMED;APPEAL OF BNSF DISMISSED.

. Duncan v. Kansas City Southern Railway Co., 2000-0066 (La. 10/30/00), 773 So.2d 670.

. Rick v. State Department of Transportation and Development, 93-1776 (La.11/14/94), 630 So.2d 1271; Carr v. Union Pacific Railroad Co., 01-909 (La.App. 5 Cir.12/26/01), 803 So.2d 427, writ denied 2002-0565 (La.4/26/2002), 814 So.2d 561; writ denied 2002-0596 (La.4/26/2002), 814 So.2d 563.

. Higgins v. American Nat. General Ins. Co., 01-193 (La.App. 5 Cir. 9/25/01), 798 So.2d 1078, writ refused 2001-2866 (La.1/25/02), 807 So.2d 248.

.See Creppel v. Coronation Shipping Co., 572 So.2d 1051, 1053 (La.App. 5 Cir.1990), writ denied, 575 So.2d 390 (La.1991), cert denied, 502 U.S. 812, 112 S.Ct. 60, 116 L.Ed.2d 36 (1991).

. Duncan v. Kansas City Southern Railway Co., supra, citations omitted.

. Healy v. National R.R. Corp. (Amtrak), 613 So.2d 1117 (La.App. 5 Cir.1993), writ denied 616 So.2d 709 (La.1993).

. Tortorich v. Otis Elevator Co., Inc. 02-275 (La.App. 5 Cir. 10/16/02), 831 So.2d 307, citing Mistich v. Volkswagen of Germany, Inc., 95-0939 (La.1/29/96), 666 So.2d 1073.